IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **FEDEQ DV004, LLC**, and **FEDEQ DV005, LLC**, Florida limited liability companies<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF PORTLAND**, a Maine body politic and corporate,<br><br>and<br><br>**JON. P. JENNINGS**, an individual,<br><br>Defendants. | ]<br>]<br>]<br>]<br>]<br>]<br>]  Case No.: **2:19-CV-00382-JHR**<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>] |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Pursuant to this Court's Order entered on July 6, 2020 (Doc. No. 57), FEDEQ DV004, LLC and FEDEQ DV005, LLC (jointly, "Plaintiffs"), by and through their undersigned counsel, hereby amend Plaintiffs' Amended Complaint against Defendants City of Portland and Jon P. Jennings, as follows:

1. Paragraphs 1-407 of the Amended Complaint and all corresponding exhibits are hereby incorporated by reference as if fully set forth herein.

2. Former "Count VIII" of the Amended Complaint is hereby re-titled "Count VII" to correct a typographical error.

3. Paragraphs 408-418 are hereby amended and/or restated in their entirety as set forth below:

408. Throughout the month of June 2015, the city was being managed on an interim basis by its police chief, Michael Sauschuck ("Sauschuck").

409. At the same time, the City was concluding its search for a new permanent City Manager.

410. The City eventually made an offer of employment to Jon P. Jennings, a self-described experienced developer and business partner in the Portland-based Forefront at Thompson's Point real estate project—a direct competitor of the Project's. A copy of the communication wherein Mr. Jennings describes himself as such is attached hereto as **Exhibit A**.

411. The City's offer of employment to Mr. Jennings, as evidenced by **Exhibit B** attached hereto, occurred on or around June 5, 2015.

412. At no time prior to June 5, 2015 was Mr. Jennings a City employee, official, officer or appointee in any sense whatsoever.

413. The City's offer of employment to Mr. Jennings was expressly ineffective, however, until review and approval by at least five (5) members of the City Council at a duly noticed City Council meeting.

414. Upon information and belief, such review and approval did not occur until at least June 15, 2015.

415. At no time prior to June 15, 2015 was Mr. Jennings a City employee, official, officer or appointee in any sense other than in his capacity as an individual who accepted an offer of employment subject to a subsequent condition (in the form of City Council approval of his employment contract) which had yet to transpire and remained in all sense only a potential occurrence.

416. Mr. Jennings's tenure as a City employee did not commence, and by the terms of his employment contract was expressly ineffective, until July 13, 2015.

417. At no time prior to July 13, 2015 was Mr. Jennings a City employee, official, officer or appointee in any sense other than in his capacity as an individual who accepted an offer of employment which, by its own terms, had yet to take effect.

418. In fact, at the time of the City's June 8th Communication to Federated, which declared the PSA expired without reason and occurred just three days after his initial and contingent offer of employment by the City, as well as at the time of the City's later June 19th Communication, Mr. Jennings was still an employee, and acting on behalf, of the City of South Portland, Maine.

419. Well in advance of the date when he became an employee or agent of the City, Mr. Jennings took it upon himself to begin actively participating in City affairs—with an apparent emphasis on matters relating to the City's Planning & Urban Development Department (the department responsible for facilitating the Project).

420. On June 19, 2015, for example, as shown in **Exhibit C** attached hereto, Mr. Jennings had a verbal conversation with Jeff Levine, Director of the aforementioned department (and author of the MDP Confirmation Letter as well as direct supervisor of the author of the Remaining Conditions Letter), pertaining to City infrastructure accounting.

421. The same day, Mr. Jennings received from Mr. Levine a detailed overview of such accounts, and forwarded the same to Mr. Sauschuck as the City's then acting City Manager.

422. The foregoing emails were received by and sent from Mr. Jennings's City of South Portland email account, underscoring the fact that he was not acting as an agent of the City in any officially sanctioned or other sense.

423. In addition, as shown by **Exhibit D** attached hereto, on June 19, 2015, the very same day as the June 19th Communication, Mr. Jennings spoke with one Kevin Bunker,

another Portland-area real estate developer, regarding a controversial development project located at 605 Stevens Avenue.

424. The same date, Mr. Jennings communicated with Mr. Sauschuck, as the City's then acting City Manager, again from his City of South Portland email account, regarding his conversation with Mr. Bunker, indicating that Mr. Bunker had received positive feedback from then current City Councilors.

425. As supported by the foregoing emails to and from Mr. Sauschuck, Mr. Levine and Mr. Bunker, well in advance of the date on which he became an agent of the City, Mr. Jennings was already involved, at a granular level, in City business discussions with the highest levels of City staff, including those directly and intimately involved in the Project.

426. Mr. Jennings's pre-employment involvement in City affairs included multiple discussions with both City staff and Federated directly regarding the Project.

427. In June 2015, prior to the June 19th Communication, Federated requested a meeting with Mr. Jennings to discuss the Project.

428. In June 2015, while he was still an employee of the City of South Portland, Mr. Jennings met with a Federated representative in person at Cia Café in South Portland, Maine (the "Project Meeting").

429. At the Project Meeting, Federated provided a detailed overview to Mr. Jennings of the Project's status and its interest in exploring a change of use.

430. At the Project Meeting, Federated explained to Mr. Jennings that it had encountered difficulties in receiving cooperation from City employees, who cited political underpinnings to their disinclination to support a change in use for the Project.

431. At the Project Meeting, Mr. Jennings specifically requested copies of all Project contracts with the City.

432. Following the Project Meeting, and weeks before his employment with the City began, Federated provided Mr. Jennings with copies of all public contracts between it and the City related to the Project.

433. At the Project Meeting, Mr. Jennings specifically asked for a list of City staff members who had been involved in the discussions to which Federated alluded.

434. At the Project Meeting, Mr. Jennings was provided, verbally, a non-exhaustive list of City employees who had been involved in recent discussions pertaining to a change of use for the Project.

435. At the Project Meeting, Mr. Jennings indicated he was going to reach out to with the purpose of directing such individuals without delay regarding the Project.

436. At the Project Meeting, Mr. Jennings requested copies of correspondence Federated had recently sent to the City Council and City staff regarding the Project.

437. Mr. Jennings indicated he had a meeting with City staff, at which he would address Federated's Project, at 1:00 pm the same date.

438. Mr. Jennings was provided with copies of correspondence Federated had recently delivered to the City Council and City staff pertaining to the Project, as he requested, and upon information and belief Mr. Jennings discussed the Project with City staff at 1:00 pm the same date as the Project Meeting.

439. In early June 2015, Mr. Mitchell, as the communicator of the June 8th Communication and author of the June 19th Communication, advised Federated that he was seeking direction from the City Council, the body responsible for offering Mr. Jennings a

position of City employment, ratifying that offer, and later overseeing Mr. Jennings, regarding the Project, rather than then acting City Manager Mr. Sauschuck.

440. On June 17, 2015, more than a week after the City issued the June 8th Communication declaring the PSA expired, a Federated representative met with City Councilor Edward Suslovic, in person, and learned that the City Council had not by that date been contacted by City staff related to the PSA or related Project matters.

440. On or around June 9, 2015, Federated requested to meet with Mr. Sauschuck to discuss the Project and the City's June 8th Communication regarding it.

441. When Federated finally met with Mr. Sauschuck, on or around June 16, 2015, Mr. Sauschuck confirmed that Mr. Jennings had previously contacted him regarding the Project, and that he had spoken to Mr. Jennings about Federated and the Project.

442. As shown on **Exhibit G** attached hereto, three days later and nearly a month before Mr. Jennings's employment commenced, when Mr. Sauschuck emailed Federated the June 19th Communication drafted by Mr. Mitchell, and effectively repudiated the PSA, he provided Mr. Jennings a direct carbon copy of such correspondence.

443. Later, on June 29, 2015, two weeks before his City employment commenced, Mr. Jennings committed, in writing, to providing Federated with an update "soon" on behalf of the City regarding the Project.

444. Notwithstanding the fact that his employment with the City had not yet commenced, Mr. Jennings provided Mr. Mitchell, the author of the June 19th Communication and the communicator of the June 8th Communication, a direct carbon copy of such correspondence.

445. On July 1, 2015, as shown in **Exhibit E** attached hereto, Mr. Mitchell, a City employee, reached out to a Federated representative by email and stated "Jon Jennings asked that I follow up with you."

446. On Friday July 10, 2015, as shown in **Exhibit F** attached hereto, Mr. Jennings sent a Federated representative an email about the Project, wherein he stated that the ensuing weekend was the "last free weekend before I begin on Monday!", effectively admitting that he was not at that point a City employee, notwithstanding is longstanding and major role in the Project's trajectory prior to that date.

447. By virtue of his many and repeated conversations with City staff regarding the Project and the PSA, including those staff members involved in both the June 8th Communication and June 19th Communication, throughout June and early July 2015, a period of time when Mr. Jennings was either (i) not a City employee, (ii) not under any ratified contract of employment with the City, (iii) not under any contract of City employment whatsoever, or (iv) still an employee of a neighboring municipality, wherein he held himself out to be an agent of the City, committed to taking control of the Project's trajectory by meeting and discussing with staff, and reviewed the merits of the parties' legal positions, Mr. Jennings falsely represented himself as a duly authorized figure of authority with regard to his status as City Manager.

448. Mr. Jennings's status as an authorized City Manager was a material fact to the communicator of the June 8th Communication and author of the June 19th Communication, when making those communications, as such individual would have directly reported to Mr. Jennings if he were in fact an authorized City Manager for the City during the time period relevant hereto.

449. By virtue of his employment agreement with the City, which expressly clarifies in a clear and unambiguous manner that Mr. Jennings's employment agreement was subject to ratification by the City Council when made, and did not confer employee status upon him until July 13, 2015, in addition to his own admission that the weekend dates of July 11-12, 2015 represented his last before he began in his new role, Mr. Jennings was at all times prior to July 13, 2015 acutely aware of his non-City employee status, and thus his lack of authority to direct City staff with respect to the Project or to speak on behalf of the City.

450. By virtue of his request for City staff members' names concerning the Project, and for Project contracts and legal positions regarding the Project, coupled with his commitment to getting involved at a staff level prior to his commencement of employment, Mr. Jennings made the aforementioned false representations, which he was fully aware (or should have been fully aware) were false, for the express purpose of inducing City staff to act or refrain from acting with regard to the Project, prior to July 13, 2015, including the City's repudiation of the PSA.

451. Upon information and belief, Mr. Jennings directed City staff to declare the PSA expired and/or directed City staff to otherwise refrain from engaging Federated with respect to the PSA, or the Project, prior to July 13, 2015.

452. As seasoned municipal employees and senior staff members with the City, both Mr. Mitchell and Mr. Sauschuck were or should have been acutely aware of the authority that the position of City Manager held over them in the hierarchy of municipal administration.

453. Accordingly, any tacit suggestion by Mr. Jennings, logical inferences by City staff about how he would prefer them to proceed, or recommendations by Mr. Jennings

regarding the Project would have intimidated City staff members to act according to his wishes.

454.   On several occasions, Mr. Jennings admitted to meeting with City staff, and City staff admitted to speaking with him, regarding the Project, prior to commencement of his employment or status as an agent for the City.

455.   By holding himself out as an authorized agent of the City between the dates of June 1, 2015 and July 13, 2015, a time when it was common knowledge among City staff that Mr. Jennings was likely the next City Manager—a position responsible for overseeing both Mr. Sauschuck and Mr. Mitchell, both as direct reports—Mr. Jennings also unlawfully coerced the foregoing individuals by making it clear that he was for all intents and purposes their supervisor and they should do as he directs, at a time when no contract or other instrument supported such a position.

456.   But for Mr. Jennings's interference with the Project prior to the commencement of his role as an agent for the City, which occurred in a fraudulent, intimidating and coercive manner, the PSA would have continued in force and effect.

WHEREFORE, Plaintiffs pray for the relief requested in former Count VIII of Plaintiffs' Amended Complaint, which request is hereby incorporated by reference as if fully set forth herein.

Dated: July 27, 2020		Respectfully Submitted

/s/ Allison A. Economy
Allison A. Economy, Esq.
RUDMAN WINCHELL
Attorney for Plaintiffs
84 Harlow Street,
Bangor, Maine 04401
(207) 992-2413
aeconomy@rudmanwinchell.com

## CERTIFICATE OF SERVICE

I, Allison Economy, hereby certify that on the 27th day of July 2020, I filed Plaintiff's Second Amended Complaint with the Clerk of the United States District Court using the CM/ECF system, which will automatically send notification electronically to the registered participants.

/s/ Allison A. Economy
Allison A. Economy